

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No.   1:15-CR-363 |
| | ) | |
| v. | ) | 18 U.S.C. § 371 |
| | ) | Conspiracy |
| | ) | (Count 1) |
| KENNETH APPLE, | ) | |
| | ) | 18 U.S.C. §§ 1343 & 2 |
| Defendant. | ) | Wire Fraud |
| | ) | (Counts 2-5) |
| | ) | |
| | ) | 18 U.S.C. §§ 1512 & 2 |
| | ) | Obstruction of an Official Proceding |
| | ) | (Count 6) |
| | ) | |
| | ) | 18 U.S.C. § 1001 |
| | ) | False Statements |
| | ) | (Counts 7-9) |
| | ) | |
| | ) | Forfeiture Notice |

## INDICTMENT

December 2015 TERM at Alexandria

THE GRAND JURY CHARGES THAT:

## INTRODUCTORY ALLEGATIONS

At all times relevant to this Indictment:

### I.    Terms and Background

1.    Provincial Reconstruction Teams ("PRTs") were operating units that were typically located at forward operating bases ("FOBs") in Iraq.   There was a PRT located in the Kirkuk Province of Iraq ("Kirkuk PRT") at FOB Warrior.   The purpose of PRTs was to support

1

the United States' counterinsurgency strategy in Iraq, support economic development, promote reconciliation, and help the Government of Iraq to hasten the transition to self-sufficiency.   PRT units included personnel from the U.S. military, U.S. Department of State, U.S. Army Corp of Engineers, U.S. Agency for International Development ("USAID") and the U.S. Department of Agriculture, among others.   PRT units worked closely with Iraqi provincial leaders and Iraqi communities, in part to oversee and dispense U.S. government funds appropriated for reconstruction projects in Iraq.

2.      Defendant KENNETH APPLE was a civilian employee with the U.S. Department of State who was assigned to the Kirkuk PRT in Kirkuk, Iraq, from January 2009 through March 2011 as an Agricultural Advisor.

3.      The Commander's Emergency Response Program ("CERP") authorized and provided funding to United States military commanders in Iraq to carry out small-scale projects designed to meet urgent humanitarian relief or urgent reconstruction requirements within their areas of responsibility and provide an immediate and direct benefit to the people of Iraq.

4.      PRTs were involved in identifying potential CERP projects, developing the scope of a proposed CERP project, and drafting the project proposal and Statement or Scope of Work ("SOW").   All CERP projects required a SOW, which set out what services were to be provided.

5.      The U.S. Department of Defense provided and disbursed funds for CERP projects. The Pentagon, which is located in the Eastern District of Virginia, oversaw funds disbursed through CERP in Iraq, including for the 2010 fiscal year.

6.      Commanders with the U.S. Army stationed in Kirkuk, Iraq, were responsible for approving, overseeing and administering CERP projects in the Kirkuk province.   The approval

2

process involved submission of a CERP packet, which included a CERP Letter of Justification, a SOW or Bill of Quantities, and a legal review by a U.S. Department of Defense attorney.

7.      In reviewing and approving CERP projects, important factors were the proposed project's ability to be: completed quickly, typically within 90 to 120 days; promote local national employment; incorporate the host nation throughout the life of the project; be highly visible to the local populace; and provide an immediate and measurable benefit to the local population.

8.      When possible, CERP projects were supposed to be awarded competitively, namely, through a competitive bid process that involved comparing bids from different potential vendors/contractors.

9.      A CERP project could be "sole sourced," meaning awarded without competition. In making sole source determinations for CERP projects, the DOD conferred with and relied on information and recommendations from the PRT.

10.     A project purchasing officer ("PPO") was a U.S. government employee who had authority to procure services and supplies on behalf of the U.S. government and was responsible for assuring that no prohibited purchases were made that violated applicable regulations or applicable standard operating procedures ("SOPs").

11.     For a given CERP project, the assigned PPO had authority to negotiate and modify contract terms on behalf of the U.S. government, including price/cost and payment schedule. To be paid, a contractor on a CERP project was required to deliver the goods or services as specified in the contract and submit an invoice to the PPO. The PPO would then prepare paperwork acknowledging receipt of goods/services, including a DD250, a U.S. government form titled

3

"Material Inspection and Receiving Report," certifying that the goods or services have been received.  The DD250 was used and relied upon in initiating payment to the contractor/vendor.

## II.    Persons and Entities

12.    Xtreme Global Logistics Solutions ("XGLS") was a Montana corporation that was created in September 2009 for the purpose of seeking and obtaining four U.S. government contracts to manufacture micro-dairy processors that were to be used by Iraqi dairy farmers.

13.    Crazy Mountain Motorsports ("CMX") was a Montana corporation incorporated in 2001 that manufactured high-performance snowmobiles.  CMX was owned and operated by M.H. and V.H..  CMX was used as a conduit for sharing proceeds from the micro-dairy contracts with J.A., thus concealing and disguising the nature and source of the payments.

14.    M.H. was a resident of Montana who owned CMX and held himself out as the owner and employee of XGLS.

15.    J.A. was a machinist who was a undisclosed, part-owner and employee of XGLS. J.A. is the son of Defendant KENNETH APPLE.

16.    JMA Performance was a Montana corporation formally created in September 2009 that was owned and controlled by J.A. and used to receive proceeds from the micro-dairy contracts.

17.    E.M. was assigned to the Kirkuk PRT from 2008 through August 2011 as a PRT Engineer.  Beginning in October 2010, E.M. was the PPO for the micro-dairy contracts and a part owner of Kirkuk Global, along with KENNETH APPLE.

18.    Kirkuk Global was a consulting company started by E.M. and KENNETH APPLE, that sought to do work in overseas economic development including the oil sector, with a

4

particular focus on Iraq.   Kirkuk Global sought to obtain U.S. government funds, including contracts and grants under the supervision of the Kirkuk PRT.

19.     Company A, an Israeli company owned by B.S., was hired by XGLS as a subcontractor to manufacture the micro-dairy processors.

20.     Company B was a U.S. company that provided short-term financing to XGLS for the micro-dairy contracts.

21.     The U.S. Department of State ("DOS"), U.S. Department of Justice, and U.S. Department of Defense ("DOD") were departments of the United States within the meaning of 18 U.S.C. § 6.

22.     The Federal Bureau of Investigation ("FBI") was part of the U.S. Department of Justice and was an agency or department of the United States within the meaning of 18 U.S.C. § 6.

23.     The Defense Criminal Investigative Service ("DCIS") and Army Criminal Investigation Division Command ("Army CID") were part of the DOD, with responsibility and authority for conducting criminal investigations on behalf of the DOD.

**III.    CERP Projects**

*Micro-Dairy Project*

24.     Micro-dairy processors are self-contained, mini-factories that are used to process milk into cheese and yogurt.

25.     The Economic/Agricultural Section of the Kirkuk PRT initiated the Hawijah Micro Dairy Processor project ("Micro-Dairy Project" or "micro-dairy contracts").   The Micro-Dairy Project was intended to enable local production of milk products, thereby reducing reliance on

costly imports, expanding the market for local farmers, and creating jobs for local Iraqis who would operate the processors.

26.      The Micro-Dairy Project ultimately consisted of four U.S. government contracts, each of which was for the manufacture and delivery of a micro-dairy processor that was to be used in a different part of Iraq: Riyadh (CMDN 102831064), Hawijah (CMDN 102851066), Altoon (CMDN 102851067), and Daquq (CMDN 102761037) (collectively the "micro-dairy contracts").

27.      The micro-dairy contracts were part of CERP and were funded by the U.S. government.  The total value of the four contracts was approximately $2 million dollars and paid for with CERP funds for the 2010 fiscal year.

28.      Before KENNETH APPLE arrived at the Kirkuk PRT, Company D, an existing U.S. company, was identified as a potential manufacturer of the micro-dairy processors based on Company D's history and experience with manufacturing similar units.

29.      By April 2009, KENNETH APPLE was assigned to the Micro-Dairy Project, in which capacity he was involved in the approval and oversight of the micro-dairy contracts.

*Center Pivot Project*

30.      A center pivot is piece of farm equipment that is used for crop irrigation.

31.      Company V is a U.S. company that manufactures agricultural equipment, including center pivots.

32.      The Economic/Agricultural Section of the Kirkuk PRT initiated the Center Pivot Irrigation Systems Project ("Center Pivot Project" or "center pivot contracts") to procure and install center pivots in the Kirkuk province.   The total value of the Center Pivot project was at least $3 million.

33.    By Spring 2010, the Center Pivot Project had been put on hold by Kirkuk PRT based on feedback from local Iraqi officials.

34.    By at least April 2010, KENNETH APPLE and E.M. were involved in attempts to cause the Kirkuk PRT to move forward with the Center Pivot Project and obtain CERP funding for the center pivot contracts.

35.    By at least April 2010, KENNETH APPLE told XGLS, J.A. and M.H. that they should pursue a U.S. government contract related to the Center Pivot Project.

36.    By at least June 2010, KENNETH APPLE and E.M. sought to have unspent CERP funds for the 2010 fiscal year allocated to the Center Pivot Project.

37.    The allegations in paragraphs 1 through 36 are realleged and incorporated in each count of this Indictment as if set forth fully therein.

## COUNT 1
### (Conspiracy to Defraud the United States)

THE GRAND JURY FURTHER CHARGES THAT:

### I.   The Conspiracy and Its Objects

38.   From a date unknown, but by at least 2009, and continuing thereafter until at least April 2011, in the Eastern District of Virginia and elsewhere, the defendant KENNETH APPLE did knowingly and intentionally combine, conspire, and agree with other persons known and unknown to the grand jury, including M.H., J.A. and E.M., to commit offenses against the United States, namely:

a. To defraud the United States, that is, to impair, obstruct, and defeat the lawful functions of the Kirkuk PRT, U.S. Department of State, and U.S. Department of Defense, in the solicitation, award, procurement, supervision, and payment of U.S. government contracts, in violation of Title 18, United States Code, Section 371.

b. To commit wire fraud, that is, having devised and intending to devise a scheme and artifice to defraud the United States, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, transmit and cause to be transmitted by means of wire communications in interstate commerce writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Section 1343.

### II.   Purposes of the Conspiracy

39.   A purpose of the conspiracy was to defraud the United States of money by secretly using KENNETH APPLE's official position to obtain and provide non-public

8

information in order to fraudulently apply for, award, win, and administer government contracts, and enrich the conspirators.

40.     It was a further purpose of the conspiracy to defraud the United States of its right to the conscientious, loyal, faithful, disinterested and unbiased services, decisions, actions and performance of duties by the defendant KENNETH APPLE in his official capacity as an employee with the U.S. Department of State with the Kirkuk PRT, free from corruption, partiality, improper influence, bias, dishonesty, and fraud in the approval, award, funding, and supervision of CERP projects.

41.     It was a further purpose of the conspiracy to provide false and fraudulent information to, and conceal material details from, the United States government regarding the nature, capabilities, experience, ownership, and status of the bidding contractor.

## III.    The Manner and Means of the Conspiracy

42.     The ways, manner, and means by which the conspirators sought to accomplish the conspiracy included, but were not limited to, the following:

a.  M.H. and J.A. formed XGLS for the purpose of seeking and obtaining U.S. government contracts in Iraq, including CERP projects overseen by KENNETH APPLE in his official capacity as a U.S. government employee.

b.  KENNETH APPLE influenced and sought to influence the award of CERP Projects.

c.  KENNETH APPLE, M.H., and J.A. caused the submission of false and fraudulent documents to U.S. government employees and members of the PRT that had material misrepresentations and intentional, material omissions.

d. KENNETH APPLE and E.M. provided assistance to XGLS, including templates, technical specifications, and information about internal U.S. government deliberations, which were used by XGLS in its submissions to the U.S. government. This assistance included, but was not limited to, the following:

    i. Providing a sample contract that was partially filled in with information provided by KENNETH APPLE.

    ii. Providing draft emails and instructions about what to say to other U.S. government employees and members of the PRT.

    iii. Contacting potential subcontractors, including Company A and Company V, on behalf of XGLS.

    iv. Drafting a revised delivery schedule for the micro-dairy processors and invoices for XGLS to submit to the U.S. government.

e. KENNETH APPLE and E.M. drafted false and fraudulent internal U.S. government communications and documents that were used and relied upon by other U.S. government employees and members of the PRT, including communications and documents about prospective contractors, sole-sourcing, contract modifications, and payment. These documents and communications were false and fraudulent in material respects and had material omissions, about, but not limited to, the following:

    i. The qualifications and experience of XGLS.

    ii. XGLS's relationship to Company A and KENNETH APPLE.

    iii. The necessity of making partial payment on the contracts in order for Company A to continue work.

       iv. The cost savings from a change in how the micro-dairy processors were shipped.

f. KENNETH APPLE and E.M. took steps to prevent the U.S. government from cancelling the contracts awarded to XGLS, including but not limited to the following:

       i. Recommending to other U.S. government employees and members of the PRT that the contracts should not be canceled.

       ii. Recommending that E.M. become the PPO for the micro-dairy contracts.

       iii. Vouching for the ability of XGLS to complete the project.

g. KENNETH APPLE, J.A., E.M., and M.H. took steps to conceal the true relationship between J.A., KENNETH APPLE and XGLS.   These steps included, but were not limited, to the following:

       i. Creating and using new email accounts to communicate and plan the conspiracy.

       ii. Purposefully omitting references to the roles of J.A. and KENNETH APPLE in XGLS in communications with other U.S. government employees and members of the PRT.

h. KENNETH APPLE, M.H., J.A., and E.M. all received directly and indirectly U.S. government money earned from the conspiracy.

i. KENNETH APPLE, J.A., E.M., and M.H. caused wire communications to be transmitted in interstate commerce in order to further the scheme.

## IV.   Overt Acts

43.   In furtherance of the conspiracy and to effect the objects of the conspiracy, the following overt acts, among others, were commited in the Eastern District of Virginia and elsewhere:

*Micro-Dairy Contracts*

a.   In or around Spring 2009, J.A. had discussions with M.D. about forming a company to pursue and obtain the micro-dairy contracts.

b.   In or around May 2009, KENNETH APPLE traveled to Montana to meet with J.A. and M.H..

c.   On or about September 1, 2009, M.H. sent an email to KENNETH APPLE stating that "[w]e have settled on a name for our new company.   It is: XTREME GLOBAL LOGISTICS SOLUTIONS   Now we can proceed with the requirements to do business."

d.   On or about September 2009, KENNETH APPLE sent M.H. information and templates for M.H. and J.A. to use in preparing XGLS' proposal to the United States for the micro-dairy contracts.

e.   On or about September 2, 2009, KENNETH APPLE sent M.H. an email in which he "suggest[ed]" that "you keep Jon's name off the website for now" and make sure he "doesn't have a title or ownership in the company."

f.   On or about September 7, 2009, KENNETH APPLE recommended to other members of the PRT and to the U.S. Army that the micro-dairy contracts be sole-sourced to XGLS.

g.   On or about September 7, 2009, KENNETH APPLE sent a memorandum to the Economic/Agricultural Section of the Kirkuk PRT, which was later forwarded to PRT

leadership, on the "Status and Need for Funding" of the Micro-Dairy Project.   In the memorandum, KENNETH APPLE provided materially false and misleading information regarding the status, background, qualifications, and experience of XGLS, while also intentionally concealing J.A.'s role in XGLS.

h.  On or about September 14, 2009, M.H. incorporated XGLS and opened a bank account in the name of XGLS.

i.  On or about September 25, 2009, J.A. created JMA Performance.

j.  In or around October 2009, KENNETH APPLE traveled to Israel to visit Company A, which was hired by XGLS to manufacture the micro-dairy processors for XGLS.

k.  In or around October 2009, J.A. and M.H. met with potential lenders in an attempt to secure financing for micro-dairy contracts.

l.  In or around September 2010, KENNETH APPLE and E.M. traveled to Israel on behalf of the U.S. government to inspect the micro-dairy processors.

m.  On or about September 2010, E.M. recommended that he become the PPO for the micro-dairy contracts.

n.  In or around October 2010, KENNETH APPLE and E.M. recommended to other members of the PRT that the micro-dairy contracts not be terminated.

o.  On or about October 31, 2010, E.M. prepared a contract modification for the micro-dairies contracts and revised delivery schedule.

p.  On or about November 1, 2010, E.M. emailed M.H. and KENNETH APPLE a copy of invoices that E.M. had prepared for XGLS to submit to the U.S. government and directed M.H. to say, if asked, that M.H. prepared the invoices with E.M.'s assistance.

q. Between on or about December 3, 2010, and December 8, 2010, M.H. paid J.A. a share of the profits from the micro-dairy contracts by writing checks totaling $40,000 from CMX to JMA Performance.

r. On or about December 20, 2010, M.H. paid J.A. a share of the profits from the micro-dairy contracts by writing a $10,000 check from CMX to JMA Performance.

s. On or about December 28, 2010, M.H. and E.M. met at a mall in the Eastern District of Virginia to discuss the micro-dairy contracts.

t. On or about December 30, 2010, M.H. paid J.A. a share of the profits from the micro-dairy contracts by writing a $48,000 check from CMX to JMA Peformance.

u. On or about January 11, 2011, J.A. wired $1,500 of the profits from the micro-dairy contracts from JMA Performance to Bank of America account ending in 6607 ("BofA account x6607"), a joint account belonging to KENNETH APPLE and S.A..

v. On or about February 7, 2011, E.M. drafted contract modifications for the two remaining micro-dairy contracts.

w. On or about February 10, 2011, KENNETH APPLE asked M.H. to have XGLS pay for J.A.'s travel on behalf of Kirkuk Global, which would then be deducted from what XGLS was going to pay for E.M.'s travel.

x. On or about February 25, 2011, M.H. paid J.A. a share of the profits from the micro-dairy contracts by writing a $15,000 check to JMA Performance.

y. On or about March 24, 2011, M.H. paid J.A. a share of the profits by writing a $20,000 check from CMX to JMA Performance.

14

z.  On or about April 5, 2011, E.M. sent M.H. an invoice for $7,433 for his two trips to Israel and asked M.H. to pay.

aa. On or about April 5, 2011, using proceeds from the micro-dairy contracts, M.H. wrote a $7,433 check from XGLS to E.M. to reimburse E.M. for his trips to Israel taken on behalf of the U.S. government.

bb. On or about April 7, 2011, M.H. paid J.A. a share of the profits by writing a $25,000 check from CMX to JMA Performance.

cc. On or about April 12, 2011, J.A. caused the issuance of a cashier's check for $3,000 of the profits from the micro-dairy contracts, which was endorsed by KENNETH APPLE and deposited into KENNETH APPLE's and S.A.'s BofA account x6607.

dd. On or about April 18, 2011, M.H. paid J.A. a share of the profits by writing a $72,062.33 check to JMA Performance.

ee. On or about April 18, 2011, J.A. wired $15,000 of profits from the micro-dairy contracts to KENNETH APPLE's and S.A.'s BofA account x6607.

*Center Pivot Projects*

ff. On or about April 27, 2010, KENNETH APPLE sent an email to E.M., M.H. and Company V, about XGLS hiring Company V to manufacture center pivots.

gg. On or about April 27, 2010, KENNETH APPLE told M.H. to review a possible source of financing for the center pivot contracts.

hh. On or about June 2, 2010, KENNETH APPLE, J.A., A.B. and W.H. met in Iraq and discussed the Center Pivot Project.

ii. On or about June 2, 2010, KENNETH APPLE emailed E.M. about changes that he, A.B., W.H. and J.A. were proposing to the Center Pivot Project.

jj. On or about June 3, 2010, E.M. emailed a draft SOW for the Center Pivot Project to KENNETH APPLE, A.B. and W.H..

kk. On or about June 3, 2010, KENNETH APPLE, E.M., J.A., A.B. and W.H. participated in a conference call to discuss the Center Pivot Project.

ll. On or about June 22, 2010, KENNETH APPLE forwarded non-public information about the Center Pivot Project to A.B..

mm. On or about July 25, 2010, E.M. emailed KENNETH APPLE, Company V, and T.E., stating that he had secured support from the local Iraqi government for the Center Pivot Project and that they needed to work on resecuring support from Kirkuk PRT.

nn. On or about August 2, 2010, E.M. sent KENNETH APPLE a draft Memorandum of Agreement ("MOA") for the Center Pivot Project.

*Other Projects*

oo. On or about October 27, 2010, KENNETH APPLE emailed J.A. and M.H. about XGLS providing micro-meat processing or micro-slaughtering systems to the U.S. government.

(All in violation of Title 18, United States Code, Section 371.)

## COUNTS 2-5
### (Wire Fraud)

THE GRAND JURY FURTHER CHARGES THAT:

### I.     The Scheme

44.     From a date unknown to the grand jury but by at least 2009 through at least April 2011, in the Eastern District of Virginia and elsewhere, the defendant KENNETH APPLE, having knowingly devised a scheme and artifice to defraud the United States, and to obtain money and property, by means of materially false and fraudulent pretenses and representations, caused to be transmitted by means of wire communications in interstate commerce certain writings, signs, signals, and sounds, for the purpose of executing such scheme and artifice to defraud.

### II.     Manner and Means

45.     The scheme and artifice to defraud are more fully described in paragraphs 42 and 43 of this Indictment, which is realleged and incorporated as if fully set forth herein.

### III.     Wire Communications in Furtherance

46.     On or about the dates shown below, in the Eastern District of Virginia and elsewhere, the defendant KENNETH APPLE, and other persons known and unknown to the grand jury, including M.H., E.M., and J.A., for the purpose of executing the scheme and artifice to defraud, and to aid and abet the same, transmitted and caused to be transmitted by means of wire communications in interstate commerce writings, signs, signals, pictures, and sounds as described for each count below:

| Count | Date | Description of Wire |
|-------|------|---------------------|
| 2 | 12/4/2010 | Email from KENNETH APPLE to E.M. and M.H. regarding XGLS training on the use of the micro-dairy processors. |

| 3 | 12/20/2010 | Email from M.H. to E.M. requesting assistance in drafting a counteroffer to Company B's payment request. |
| 4 | 12/23/2010 | Email from M.H. to J.A., KENNETH APPLE, and E.M. confirming receipt of a payment on the micro-dairy contracts and XGLS' negotiations with Company B. |
| 5 | 12/27/2010 | Email from M.H. to E.M. about meeting on December 28, 2010. |

(All in violation of Title 18, United States Code Section 1343 and 2.)

## COUNT 6
### (Obstruction of an Official Proceeding)

THE GRAND JURY FURTHER CHARGES THAT:

47.    On or about April 8, 2013, KENNETH APPLE spoke via Skype to Special

Agents with the FBI and Army CID who were in the Eastern District of Virginia.    During the

call, the agents identified themselves as federal law enforcement officers.

48.    On or about April 15, 2013, KENNETH APPLE was telephonically interviewed

by Special Agents with the FBI, Army CID and DCIS who were in the Eastern District of

Virginia.    During the call, the agents identified themselves as federal law enforcement officers

and KENNETH APPLE stated that he understood that it was a crime to make a false statement to

a federal law enforcement officer under Title 18, United States Code, Section 1001.

49.    On or about August 7, 2013, J.A. was served with a federal grand jury subpoena

related to an ongoing federal grand jury investigation and criminal investigation of the

micro-dairy contracts that was being conducted by the FBI, DCIS, and Army CID.

50.    On or about June 9, 2014, a Special Agent with the FBI served KENNETH

APPLE with a federal grand jury subpoena and a related letter from the U.S. Attorney's Office

from the Eastern District of Virginia.    This grand jury subpoena related to an ongoing federal

grand jury investigation and criminal investigation of the micro-dairy contracts.

51.    From a date unknown to the grand jury but by at least April 2013 and continuing

through at least June 2014, in the Eastern District of Virginia and elsewhere, defendant

KENNETH APPLE corruptly obstructed, influenced, and impeded, and attempted to obstruct,

influence and impede an official proceeding, to wit, a federal grand jury investigation, in

violation of Title 18, United States Code, Section 1512(c)(2).

19

52.     The manner and means by which the defendant attempted, through a continuing course of conduct, to obstruct the official proceeding included, among others, the following:

53.     KENNETH APPLE made materially false and misleading statements as well as made material omissions that sought to conceal the true circumstances surrounding the creation of XGLS; the manner in which XGLS learned of, sought, and received the micro-dairy contracts; and KENNETH APPLE's relationship with XGLS.

54.     KENNETH APPLE's false statements and representations included those set forth in Paragraphs 56, 59, and 62, which are hereby incorporated and realleged as if fully set forth herein.

(All in violation of Title 18, United States Code, Sections 1512(c)(2) and 2.)

20

## COUNT 7
### (False Statements and Representations)

THE GRAND JURY FURTHER CHARGES THAT:

55.     The allegations in paragraphs 47 through 50 are realleged and incorporated in as if set forth fully therein.

56.     That on or about April 15, 2013, defendant KENNETH APPLE did willfully and knowingly make materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of Government of the United States, specifically a criminal investigation that was being conducted by the FBI, DOD, and U.S. Department of Justice, by stating and representing to Special Agents from the FBI and DCIS in the Eastern District of Virginia that before the micro-dairy contracts were awarded, KENNETH APPLE made a trip to meet the owner of XGLS and to learn about XGLS, but stated that he could not recall the name of the owner of XGLS.

57.     The statements and representations were false because as KENNETH APPLE then and there knew:

a.  XGLS did not exist when KENNETH APPLE initially met M.H..

b.  XGLS was created by M.H. based on directions from KENNETH APPLE, for the purpose of obtaining the micro-dairy contracts.

(All in violation of Title 18, United States Code, Sections 1001 and 2.)

21

## COUNT 8
### (False Statements and Representations)

THE GRAND JURY FURTHER CHARGES THAT:

58.     The allegations in paragraphs 47 through 50 are realleged and incorporated in as if set forth fully therein.

59.     That on or about June 2014, defendant KENNETH APPLE did willfully and knowingly make materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of Government of the United States, specifically a criminal investigation that was being conducted by the FBI, DOD and U.S. Department of Justice, by stating and representing to Special Agents from the FBI, DCIS, and Army CID in the Eastern District of Virginia that KENNETH APPLE did not receive any money from the micro-dairy contracts from J.A..

60.     The statements and representations were false because KENNETH APPLE then and there knew that he did receive money from the micro-dairy contracts from J.A., including on the following occasions:

a.  On or about January 11, 2011, J.A. wired $1,500 of the profits from the micro-dairy contracts from JMA Performance to KENNETH APPLE's and S.A.'s BofA account x6607.

b.  On or about April 12, 2011, J.A. caused the issuance of a cashier's check for $3,000 of the profits from the micro-dairy contracts, which was endorsed by KENNETH APPLE and deposited into BofA account x6607.

c.  On or about April 18, 2011, J.A. wired $15,000 of profits from the micro-dairy contracts to BofA account x6607.

22

(All in violation of Title 18, United States Code, Sections 1001 and 2.)

## COUNT 9
### (False Statements and Representations)

THE GRAND JURY FURTHER CHARGES THAT:

61.     The allegations in paragraphs 47 through 50 are realleged and incorporated in as if set forth fully therein.

62.     That on or about June 2014, defendant KENNETH APPLE did willfully and knowingly make materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of Government of the United States, specifically a criminal investigation that was being conducted by the FBI, DOD and U.S. Department of Justice, by stating and representing to Special Agents from the FBI, DCIS, and Army CID in the Eastern District of Virginia that KENNETH APPLE did not steer the micro-dairy contracts to J.A., and that he did not steer or manipulate the Kirkuk PRT with respect to the micro-dairy contracts in order to get money to J.A..

63.     The statements and representations were false because as KENNETH APPLE then and there knew, XGLS received the micro-dairy contracts because of actions, writings, and recommendations by KENNETH APPLE in his official capacity as a U.S. government employee while posted to the Kirkuk PRT, in which KENNETH APPLE intentionally misrepresented the qualifications of XGLS and did not disclose the involvement or financial interest that his son, J.A., had or would have in XGLS and the micro-dairy contracts.

64.     The statements and representations were also false because as KENNETH APPLE then and there knew, J.A. was a part-owner and employee of XGLS to whom it was agreed that profits from the micro-dairy contracts would be paid, and XGLS was a new company that did not have the experience or qualifications claimed by KENNETH APPLE.

24

(All in violation of Title 18, United States Code, Sections 1001 and 2.)

## Forfeiture Notice

THE GRAND JURY FURTHER FINDS PROBABLE CAUSE TO BELIEVE THAT:

65.     Pursuant to Rule 32.2(a), the defendant is hereby notified that, if convicted of any of the conspiracy and wire fraud offenses alleged in Counts 1-5 above, he shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to such offenses, including, but not limited to, the following property:

a.  2010 Toyota Tundra, VIN 5TFHY5F1XAX119434;

b.  A sum of money equal to at least $1,963,000 in United States currency, representing the amount of proceeds obtained as a result of the violations of 18 U.S.C. §§ 371 and 1343;

c.  Pursuant to Title 21, United States Code, Section 853(p), as incorporated by 28 U.S.C. § 2461(c), the defendant shall forfeit substitute property, up to the value of the amount described in subparagraph b, if, by any act or omission of the defendant, the property described in subparagraph b, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty.

(In accordance with Title 18, United States Code, Section 981(a)(1)(C); Title 28, United States Code, Section 2461(c); and Rule 32.2(a), Federal Rules of Criminal Procedure.)

A TRUE BILL

Pursuant to the E Government Act,
the original of this page has been filed
under seal in the Clerk's Office.

_____

FOREPERSON OF THE GRAND JURY

Dana J. Boente
United States Attorney

By: _____

Uzo Asonye
Katherine L. Wong
Assistant United States Attorneys
Eastern District of Virginia
Counsel for the United States
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Phone: (703) 299-3700
Fax: (703) 299-3981
Email: Katherine.l.wong@usdoj.gov
       Uzo.asonye@usdoj.gov